COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-175-CR

 

 

HARDY DON CAPPS                                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

              FROM THE 271ST  DISTRICT
COURT OF JACK COUNTY

 

                                              ------------

 

MEMORANDUM OPINION[1]
ON APPELLANT=S PETITION FOR
DISCRETIONARY REVIEW

 

                                              ------------

Pursuant to rule of appellate procedure 50, we
have reconsidered our previous opinion on Appellant Hardy Don Capps=s
petition for discretionary review.[2]  We withdraw our judgment and opinion dated
October 18, 2007, and substitute the following.








A jury convicted Appellant of murder and assessed
his punishment at life imprisonment in the Institutional Division of the Texas
Department of Criminal Justice and a fine of $10,000.  The trial court sentenced him accordingly.        Appellant brings six points on appeal,
arguing that the trial court erred by refusing to quash the prospective venire
panel and by denying a mistrial when the prosecutor improperly interjected his
personal opinion as to Appellant=s guilt
during voir dire and final argument, respectively (points one and six); that
the evidence is both legally and factually insufficient (points two and three);
and that the trial court erred by excluding impeachment evidence and by
admitting Appellant=s jailhouse conversations
(points four and five).  Because we hold
that the evidence is both legally and factually sufficient to support the jury=s
verdict and that the trial court did not err, we affirm the trial court=s
judgment.

Summary of Facts

Appellant=s wife
Gina Capps was killed on December 16, 1995. 
Her body and her pickup were found off of Highway 59 in Jack County,
Texas, about five miles outside of Jacksboro.








Lane Akin, the Texas Ranger who investigated the
murder, testified that when he arrived at the scene, he discovered a pickup
truck parked by the side of the road. 
The truck=s window was down, and the
engine was still running.  Inside the
truck, he found a two-year-old child, unharmed, strapped into a car seat.  In a ditch beside the truck, he found the
body of Gina Capps.  Akin observed both
slash and cut wounds to the body.  He
concluded that there had been a struggle outside the truck and that a knife had
been used to cause the wounds during the struggle.  The medical examiner testified that the
complainant was killed with a knife with a serrated edge.

Akin spoke with Appellant, the complainant=s
husband, who suggested Michael Dearick, the complainant=s former
husband, as the possible killer, explaining that Dearick had been abusive to
the complainant in the past and was currently behind on child support.  Appellant stated that the complainant and
Dearick had planned to meet for a child visitation exchange that morning in
Jacksboro.

Michael Dearick testified that Gina had been
insured and that the primary beneficiary was Appellant.  Dearick also testified that he owed $8,000 in
child support to Gina but claimed that they had worked out the arrearage between
themselves.  Dearick also admitted that
he had been jailed twice for Amess[ing]
with@ Gina
but claimed that they had had no problems when they met in Jacksboro the day
she was killed.  Lisa Callahan, who was
Dearick=s wife
on the day of the murder, testified that she had been with him when he picked
up Gary, his child with Gina, from Gina around 8:45 a.m. that day.








In explaining his own whereabouts, Appellant
claimed variously that he had gone deer hunting, that he had gone to his
office, that he had gone to check on oil wells, and that he had stayed in bed
until being notified to call the sheriff=s
office.  Appellant denied that there were
problems in his marriage to Gina and denied knowing that Gina was planning to
leave him.  He admitted that he and Gina
had had one argument during their three-and-a-half-year marriage.

Appellant told Akin that on December 16,

The alarm had gone
off.  They had gotten up early.  He went outside to check the oil on her car,
and I think at one point he said it was at 6:35 a.m. on that misty morning when
he went out to check the oil, the water, and the transmission fluid on
. . . her pickup.

He helped her get the boys ready, and then she left at about 7:00 and
drove toward Saint Jo.

 

Appellant also told Akin that he drove behind Gina for about fifteen
or twenty minutes in that direction, that he received the phone call about the
murder around 10:00 a.m. at home, and that he then drove to Jacksboro, stopping
in Nocona to get gas.








Appellant talked to then deputy sheriff Danny
Nash, now the sheriff of Jack County. 
Appellant told Nash that Athey had
got[ten] up around 6:00 o=clock.  Gina dressed and then dressed the two boys,
and they ate.  He [then] went out and
checked the oil and water in the pickup.@  Appellant stated that he left the house at
around 7:15 a.m. that morning, after Gina did, to go check the wells.  When he got back home, the telephone company
called to give him the phone number of the Jack County Sheriff=s
Office.

Nash testified that Appellant called the sheriff=s office
between 9:56 and 9:58 and that the logs reflected that.  The log in Defense Exhibit 5 does not contain
an entry for when Appellant called, but it does contain an entry at 9:51
providing, AContact family.  Texas Ranger@ and a
series of numbers.  The dispatcher
testified that he believed that this entry indicated that the sheriff had
called him to contact the family, the Texas Rangers, a deputy, and the highway
patrol.  He further testified that he
believed that he was talking to Appellant within a matter of minutes.

Gina=s older
son testified that he was seven years old when his mother was killed.  He testified that Appellant did not get out
of bed before he and his mother and brother left the house on the morning of
his mother=s death and did not go out and
check the oil and water in her pickup. 
The youth also testified that things were Apretty
good@ for the
most part between his mother and Appellant, except when Appellant was drinking
and Aall that
other stuff,@ and that Appellant would not
return his mother=s kiss that morning, which was
unusual.








Appellant testified that he had lied to the
police in all of his statements, that he had checked the oil and water in Gina=s pickup
around 2:30 or 3:30 a.m. on the morning of her death, that he had not gotten up
before she and the children left that morning, and that he did not leave the
house until he got the telephone call from the telephone company sometime
before noon asking him to call the sheriff, which he did immediately.

Akin testified that it takes less than an hour to
drive from Appellant=s home in Montague County to
Jacksboro.








Deputy Nash testified that Curtis Keck had given
him a knife that was similar to the knife Keck had given Appellant for
Christmas.  The knife was admitted into
evidence as State=s exhibit 45.  Curtis Keck testified that he was Appellant=s cousin
and had given Appellant a serrated knife as a gift the day before Gina
died.  Keck also testified that Appellant
kept the knife in his pickup and that the knife he had given Appellant was similar
to State=s
exhibit 45.     Keck testified that he had
seen Gina and Appellant together the night before her death and that Gina had
seemed afraid that day, but he did not know why.  Keck testified that Appellant went drinking
at the VFW Hall that night.  Keck
testified that Appellant showed no emotion regarding Gina=s death
and that he had to force Appellant to go to Gina=s
funeral.  Later, Appellant told Keck not
to say anything about his not going deer hunting the day Gina died.  Keck also testified that he never again saw
the knife that he had given Appellant and that Appellant never told him what
had happened to it.

Appellant consented to a search of his home and
his pickup.  The officers found knives
and a sharpening stone, but according to Ranger Akin, the pickup Alooked
as if it had been Armoralled, so it was spotless,@ and no
blood was found on the knives.

Dr. Wayne Porter, a veterinarian, testified that
sometime between 8:00 and 10:00 a.m. on the day of the murder, he had seen
someone whom he believed both at the time of the sighting and at the time of
trial to be Appellant in Bowie, about twenty-five miles from the murder scene.








Randall Bell testified that on the morning of
Gina=s death,
as he was leaving Bowie, close to Jacksboro, he saw a small car traveling very
fast and swerving on the road, crossing the center line.  Inside the vehicle were a man and a
woman.  The man was taking his jacket
off.  The vehicle passed him going toward
Bowie.  About four miles and a short time
later, he saw a person that he thought, but was not completely sure, was
Appellant driving a white pickup very fast and swerving on the road approaching
him.  A short while later, he saw the
murder scene and the pickup truck parked there. 
Bell told Pete and Gayle Abbott, Gina=s sister
and brother-in-law, what he had seen. 
They told him that there had been a life insurance policy on Gina.  Later, a friend of Appellant=s called
and told Bell not to tell anyone what he had seen.  Evidence showed that Bell had told the Texas
Rangers that he thought Appellant had killed Gina for the insurance money.

Luz Garcia testified that she was with Randall
Bell when the first erratically driven car passed them on the highway.  She did not initially remember another
vehicle=s
passing them before they came upon Gina=s blue
pickup truck parked on the side of the highway. 
After the prosecutor refreshed her memory, she remembered the second
vehicle that was Aspeeding and driving crazy.@  When the State published her out-of-court
statement to the jury, however, the sequence of events was clear.  She had said at that time,

Randall [Bell] said something about two vehicles that were speeding
and driving crazy; this was between Bowie and Jacksboro.  I do not remember that kind of vehicle.  Before we got to Jacksboro, we saw two
vehicles on the side of the road. They were on my left.  It was so long ago, I can=t remember what type of
vehicles.

 

Randall said one of the vehicles looked like one that belonged to a
friend.  He said it looked like a vehicle
that belonged to Gina. 

 








Marlin Thompson, who had met Appellant while they
were in jail together, claimed that Appellant had told him that he had kept his
hands clean by having someone else kill his wife for him.  Thompson claimed that Appellant had told him
that he had hired a man and a woman to kill his wife, but he gave no
names.  Thompson said that Appellant told
him that the couple knew Gina and were connected to him because he was their
methamphetamine cook.  Thompson said that
Appellant claimed that he had been in the vicinity of the murder when the two
people committed it for him and that as he left the scene alone in his pickup
truck bound for Bowie, he had been seen on the road by someone who knew
him.  Thompson claimed that Appellant had
told him this story about a month before trial.

Thompson admitted that he was present in the
courtroom at a pretrial hearing when there was a discussion of a witness (Dr.
Porter) who could almost certainly identify Appellant.  Defense counsel inquired what Thompson
expected to gain from testifying for the State. 
Thompson denied that he would receive a benefit.

Kim Lemons testified that when she was involved
with Appellant in 1996, he had told her that Ahe had
it done@ to Gina
and for her not to tell because Ayou and
your kids could be done just as easy.@  She said that Appellant had told her that if
he could not have his son Colby, no one could.

Patricia Burnett testified that about a month
after Gina=s death, she had asked Appellant
if he had killed her.  She testified that
he replied, A[N]o, he had it hired done.@








Lynn Glasker testified that she had known
Appellant since 1976.  He began calling
her at the end of September 1995.  He
told her that he had problems in his marriage to Gina and needed someone to
talk to.  After Gina=s death,
Appellant told Lynn that Gina had been a bitch. 
He had wanted a divorce, and she refused to give him one.

Kim Flowers testified that she had known
Appellant and had dated him off and on for a few years.  Once when Appellant was drunk, he threatened
to cut off her breasts and stuff them down her throat.  He then told her that he knew the location of
the murder weapon that his wife had been killed with.  When Flowers asked Appellant about the
murder, he said he did not kill Gina but he knew who did.  Later, he denied that statement.

Appellant remarried after Gina=s
death.  The State recovered taped
conversations Appellant had with his wife Kelly, his mother, and Cindy
Hedeman.  Dick Johnson, a Texas Ranger,
testified that the Wichita County Jail had the equipment set up to record
telephone conversations.  The calls
themselves showed that the party receiving calls was aware that the calls were
being recorded and, according to the State, was waiving confidentiality as to
the Jack County calls.  Johnson stated
that he reviewed all of Appellant=s calls.








Kelly Capps, Appellant=s new
wife, testified only after being offered immunity.  She testified that she and Appellant did not
marry until May 5, 2003, and that the relevant conversations with Appellant she
relayed in her testimony (as opposed to those taped when Appellant was
confined) occurred before the marriage. 
She testified that she had met Appellant six years before his
trial.  She claimed that Appellant had
talked to her about the murder weapon used to kill Gina.  Kelly testified that Appellant had claimed
that he knew where the murder weapon was. 
Appellant also told her that Gina had wanted a divorce.  Kelly claimed that at one point, Appellant
had told her the name of the man who had killed Gina.  She also testified that when he got mad at
her, he told her, AI=ve got
away with it once.  I=ll do it
again,@ or AWhat
happened to her will happen to you.@  Kelly testified that she was afraid of what
Appellant would do to her if he found out that she had betrayed him.  She admitted that she had used drugs
throughout her relationship with Appellant and that, although still married to
Appellant, she was at the time of trial pregnant by another man.  Kelly also testified that Appellant had her
write him a letter saying that she had lied in her earlier statements about
him.








Shawn Nix testified that she had lived with
Kelly, Appellant, and Appellant=s son
Colby for a short time in either 2001 or 2002. 
She testified that while she was living with them, Appellant had told
Kelly and her that Gina got what she deserved and referred to Gina as Athe
bitch.@  She also testified that Appellant would tell
Colby that they were better off without AMomma.@  Mark Peterson, a criminal investigator with
the Jack and Wise County District Attorney=s
Office, interviewed the two-year-old Colby on the day that his mother was
killed.  In response to Peterson=s
questioning about who had hurt Colby=s
mother, Colby answered that he did not know but stated that his brother had
left with a woman and confirmed that he had spoken with a woman.  Appellant was present when Peterson
questioned Colby, and Peterson said that Colby would not allow his father to
leave.  Ultimately, Peterson testified
that he gained no evidentiary value from his conversation with the two-year-old
Colby.

Frankie Hess testified that he was Appellant=s
employer and that Appellant drove a red and white truck.  A re-enactment of Gina=s murder
was broadcast on television.  The only
information received in response to the re-enactment came from a truck driver
who provided information that pointed to someone other than Appellant as the
culprit.  No fingerprint or DNA evidence
connected Appellant or anyone else to the murder.

Sufficiency of the
Evidence








The jury was charged on the law of parties.  The jury charge therefore allowed the jury to
convict Appellant as a principal or a party. 
Appellant gave conflicting accounts of his actions on the day of the
murder.  Several women testified that
Appellant had hinted about or admitted to killing or having hired someone else
to kill Gina.  While some witnesses who
testified that they saw Appellant near the scene of the murder were hesitant in
their identification, Porter was sure enough that it was Appellant that he
thought about Arunning him down@ to talk
about a particular well when he saw him on the morning of the murder.  At trial, Porter=s level
of certainty was the same.

Appellant=s cousin
testified that he had given Appellant a knife with a serrated edge.  The knife that was admitted as State=s
exhibit 45, which Appellant=s cousin
had given to a sheriff=s deputy and which Appellant=s cousin
testified was similar to the knife he had given Appellant, was consistent with
the knife that caused the fatal stab wound. 
Witnesses testified that Appellant had told them that he knew where the
weapon that killed Gina was.

Based on our review of the evidence, as detailed
above, and applying the appropriate standards of review,[3]
we hold that the evidence is legally and factually sufficient to support the
jury=s
verdict.  We overrule Appellant=s second
and third points.

 

 








Prosecutor=s
Personal Opinion

In his first and sixth points, Appellant argues
that the trial court reversibly erred by refusing to quash the prospective
venire panel when the prosecutor injected his personal opinion about Appellant=s guilt
at the beginning of voir dire and by refusing to declare a mistrial when the
prosecutor injected his personal feelings about Appellant=s guilt
during final argument.  In voir dire, the
prosecutor explained the concept of the presumption of innocence.  In his explanation, he stated that he and the
district attorney would not be there if A[they]
didn=t think
that [they] could prove something.@  Appellant objected to the expression of
personal opinion, and the trial court sustained the objection and instructed
the jury to disregard.  Appellant moved
to quash the venire panel, and the trial court overruled the request.








In final argument, during the guilt phase of the
trial, the prosecutor stated, A[W]e
submit there is no reasonable doubt. 
There=sCI wouldn=t think
there=s any
doubt at all.@ 
Appellant objected to the statement of personal opinion, and the
conscientious trial court sustained the objection, instructed the jury to
disregard the statement, and denied Appellant=s motion
for mistrial.      When the trial court
sustains an objection and instructs the jury to disregard but denies a
defendant=s motion for a mistrial (or
motion to quash the venire panel), the issue is whether the trial court abused
its discretion by denying the motion.[4]  Only in extreme circumstances, when the
prejudice caused by the improper argument is incurable, that is, Aso
prejudicial that expenditure of further time and expense would be wasteful and
futile,@ will a
mistrial be required.[5]  In determining whether the trial court abused
its discretion by denying the mistrial, we balance three factors:  (1) the severity of the misconduct
(prejudicial effect), (2) curative measures, and (3) the certainty of
conviction absent the misconduct.[6]








The prosecutor made the statement during voir
dire as he was distinguishing Aactual@ from Apresumed@
innocence and did not repeat it.  The
statement during closing argument occurred after the prosecutor said, A[W]e
submit there is no reasonable doubt,@ and
appears to refer more to the strength of the State=s case
based on the evidence, as viewed by the prosecutor, than the prosecutor=s
personal opinion of Appellant=s guilt.[7]  We note that the prosecutor later stated that
Appellant was A100 percent guilty@ with no
objection.  Finally, the record contains
legally and factually sufficient evidence from several sources of Appellant=s
guilt.  Consequently, we cannot say that
the trial court abused its discretion by refusing to quash the venire panel or
by denying a mistrial.  We overrule
Appellant=s first and sixth points.

Impeachment of
Complainant=s Good Character

In his fourth point, Appellant argues that the
trial court reversibly erred by refusing to allow him to introduce before the
jury evidence of Gina=s extramarital affairs and
felony theft probation.  Michael Dearick
and Gayle Abbott testified that the complainant was a good mother.  Dearick testified that she never gave anyone
any trouble and took care of her children. 
Abbott also testified that her sister would not have pulled over for a
stranger.  In response, Appellant
attempted to inquire into both witnesses=
knowledge of Gina=s felony theft probation and
extramarital affairs.  The trial court
did not allow the inquiries.








Appellant argues that he wanted to show that Gina
might have pulled over for a man other than him because she had an affair
during their marriage.  Appellant cites
no law for the proposition that the trial court erred by refusing to allow him
to impeach Dearick=s and Abbott=s
opinion of the complainant.  Appellant, therefore,
has failed to preserve that complaint on appeal.[8]








Further, we do not view the witnesses=
testimony that Gina was a good mother and would not have pulled over for a
stranger as testimony of her good character. 
Regardless, Dearick testified without objection that Gina Awas a
great mom.  She really never g[a]ve you
any trouble.  She took care of her kids@ and
answered affirmatively that that was a priority for her.  While Appellant did object to the prosecutor=s asking
Dearick if Gina would have pulled over on the side of the road for a stranger,
he did not object when Abbott testified that Gina was a very good mom and would
not have pulled over for a stranger. 
Appellant has therefore failed to preserve a complaint about the State=s
offering evidence of the deceased=s
character, if that was his complaint.[9]  We overrule Appellant=s fourth
point.

Recorded Statements

Appellant objected on the bases of hearsay,
privilege, and nonhearsay statements of a coconspirator to the admission of the
recorded conversations between him and his wife Kelly and his mother, contained
in State=s exhibits
69, 70, and 71.  The recordings in
exhibits 69 and 70 were made when Appellant was incarcerated in the Wichita
County Jail; the recordings in the remaining exhibit were made when he was
incarcerated in the Jack County Jail. 
Appellant also complained that Ranger Johnson could not properly
authenticate the accuracy of the recordings. 
In his fifth point, Appellant raises the same grounds on appeal.








Initially, we hold that the calls were not
privileged because Appellant did not have the requisite expectation of privacy.[10]  Appellant concedes that he signed a statement
acknowledging that the telephone calls might be monitored by the Wichita County
Sheriff while he was in that county=s
jail.  He therefore had no expectation of
privacy in the recordings in State=s
exhibits 69 and 70.  While the record
contains no similar document signed when he was in the Jack County Jail,
Appellant testified that he knew that all of his telephone calls were being
recorded.  Further, exhibit 71,
containing the calls from Jack County, did not contain calls between him and
his wife.  Consequently, none of the
calls were privileged.

Appellant appears to argue that his own
statements were hearsay.  The defendant=s
recorded statements against interest offered in a criminal case are not
hearsay.[11]  Further, to the extent that Appellant
complains that the other parties= words
in the conversations were improperly admitted over his hearsay objections, we
note that those seven words spread over three conversationsCAYes,@ AYeah,@ AYes,@ AYeah,@ AYeah,@ ARight,@ and ARight@C do not
appear to have been offered for the truth of the matter asserted, and, even if
they were, could have had no impact on his conviction.








Appellant argues that the most egregious
evidentiary ruling concerning the taped conversations was the ruling allowing
Ranger Johnson to testify to the authenticity of the tape recordings.  Specifically, Appellant appears to complain
about the part of the recording indicating that Appellant was an inmate placing
calls from each jail.  He contends that
there is no other indication that the recordings were made in the jails.  Appellant cites no law for his authenticity
argument and has therefore failed to preserve it.[12]  Appellant also argues that his mother=s voice
was not identified on the tapes. 
Although Appellant directs us to a reference to an Aunidentified@ voice
on pages 333-335 of the third volume of the reporter=s
record, Appellant does not direct us to the portion of the record in which he
raised this specific complaint below; he has therefore also failed to preserve
it.[13]  In the interest of justice, however, we note
that rule 901 of the Texas Rules of Evidence provides in relevant part,

(a) General Provision.  The
requirement of authentication or identification as a condition precedent to
admissibility is satisfied by evidence sufficient to support a finding that the
matter in question is what its proponent claims.

 

(b) Illustrations.  By way of illustration only,
and not by way of limitation, the following are examples of authentication or
identification conforming with the requirements of this rule:

 

(1) Testimony of witness with knowledge.  Testimony that a matter is what it is claimed
to be.

 








. . .
.

 

(5) Voice identification.  Identification of a voice, whether heard
firsthand or through mechanical or electronic transmission or recording, by
opinion based upon hearing the voice at anytime under circumstances connecting
it with the alleged speaker.[14]

In addition to the information provided by the
recordings, Texas Ranger Dick Johnson testified that the exhibits were of
Appellant=s recorded jailhouse
conversations, that he had obtained the exhibits from Wichita County jail
personnel and that he had reviewed them at that jail, and that the recording in
exhibit 71 occurred in Jack County Jail. 
He also identified most of the voices on the recordings[15]
and testified that he had interviewed Appellant before his confinement.  We note that the jury also heard Appellant=s live
testimony.  Consequently, we hold that
the trial court did not abuse its discretion by overruling the objections as to
authenticity.








Finally, to the extent that Appellant is
complaining again here in a roundabout way about privilege, he testified that
he signed a release regarding his conversations at Wichita County Jail, that he
knew his jailhouse telephone conversations were being recorded, and that he was
confined from September 16, 2003 until trial. 
Ranger Johnson testified to the dates of the telephone conversations
recorded without objection regarding the dates, and those dates all fall within
Appellant=s period of confinement.

In addition to the grounds raised at trial,
Appellant argues for the first time on appeal that the recordings contain
statements about plea bargaining in violation of rule 410 of the Texas Rules of
Evidence.[16]  Appellant did not raise this complaint below
and therefore has not preserved it for appeal.[17]  We overrule Appellant=s fifth
point.

Conclusion

Having overruled Appellant=s six
points, we affirm the trial court=s
judgment.

 

 

LEE
ANN DAUPHINOT

JUSTICE

PANEL A:   CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

PUBLISH

DELIVERED:  December 6, 2007











[1]See Tex. R. App. P. 47.4.





[2]See Tex. R. App. P. 50.





[3]See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton
v. State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005) (both providing legal
sufficiency standard of review); Watson v. State, 204 S.W.3d 404,
414-15, 417 (Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d 795,
799 (Tex. Crim. App. 2005); Sims v. State, 99 S.W.3d 600, 603 (Tex.
Crim. App. 2003); Johnson v. State, 23 S.W.3d 1, 8-9, 11-12 (Tex. Crim.
App. 2000); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)
(all providing factual sufficiency standard of review).





[4]Hawkins v. State, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004) (concerning mistrial); Mendoza
v. State, 552 S.W.2d 444, 446‑47 (Tex. Crim. App. 1977) (concerning
quashing venire panel).





[5]Hawkins, 135
S.W.3d at 77; see also Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim.
App. 2003), cert. denied, 542 U.S. 905 (2004).





[6]Mosley v. State,
983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999).





[7]See Wolfe v. State, 917 S.W.2d 270, 281 (Tex. Crim. App. 1996) (A[T]he
prosecutor may argue his opinions concerning issues in the case so long as the
opinions are based on the evidence in the record and not as constituting
unsworn testimony.@).





[8]See Tex. R. App. P. 38.1(h); Tong v.
State, 25 S.W.3d 707, 710 (Tex. Crim. App. 2000), cert. denied, 532
U.S. 1053 (2001); Mosley, 983 S.W.2d at 256.





[9]See Tex. R. App. P.
33.1(a)(1); Mosley, 983 S.W.2d at 265; Fuentes v. State, 991
S.W.2d 267, 273 (Tex. Crim. App.), cert. denied, 528 U.S. 1026 (1999).





[10]See Tex. R. Evid. 504(a).





[11]See Tex. R. Evid. 803(24).





[12]See Tex. R. App. P. 38.1(h); Tong,
25 S.W.3d at 710; Mosley, 983 S.W.2d at 256.





[13]See Lawton
v. State, 913 S.W.2d 542, 554 (Tex. Crim. App. 1995), cert. denied,
519 U.S. 826 (1996), overruled on other grounds, Mosley, 983
S.W.2d at 263; Alvarado v. State, 912 S.W.2d 199, 210 (Tex. Crim. App.
1995).





[14]See Tex. R. Evid. 901.





[15]See Jones v. State, 80 S.W.3d 686, 689 (Tex. App.CHouston [1st Dist.] 2002, no pet.) (stating appellate
court is unwilling to read into rule 901 a requirement that each person, no
matter how irrelevant to case, be identified by name).





[16]Tex. R. Evid. 410.





[17]See Tex. R. App. P. 33.1(a)(1); Mosley,
983 S.W.2d at 265.